## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PAUL BUMPAS and FRED VAN NOY,

*Plaintiffs*,

v.

MISSOURI HOUSING DEVELOPMENT
COMMISSION (MHDC), MIKE PARSON,
in his official capacity as Governor of
Missouri and Commissioner of MHDC,
MIKE KEHOE, in his official capacity as Lt.
Governor of Missouri and Commissioner of
MHDC, VIVEK MALEK, in his official
capacity as State Treasurer and Commissioner
of MHDC, ANDREW BAILEY, in his official
capacity as Attorney General of Missouri and
Commissioner of MHDC, DANNY P.
CHADAKHTZIAN, in his official capacity as
Commissioner of MHDC, MARK ELLIFF, in
his official capacity as Commissioner of
MHDC, TRACEY S.C. LEWIS, in his
official capacity as Commissioner of MHDC,
RICK MCDOWELL, in his official capacity
as Commissioner of MHDC, STEPHEN J.
PARSHALL, in his official capacity as
Commissioner of MHDC, TAMEKA
RANDLE, in her official capacity as
Commissioner of MHDC, KIP STETZLER,
in his official capacity as Executive Director
of MHDC, and STEVE WHITSON, in his
official capacity as Director of Community
Programs for MHDC,

*Defendants*.

Civil Action No. _____

**Complaint – Class Action**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Paul Bumpas and Fred Van Noy bring this action for declaratory relief and damages on behalf of themselves and a Class of others who were similarly discriminated against based on the color of their skin. Plaintiffs bring this case against the following Defendants, who chose to violate federal law in order to promote an unconstitutional, race-based social agenda : (i) Missouri Housing Development Commission (MHDC); (ii) Mike Parson, in his official capacity as Governor of Missouri and Commissioner of MHDC; (iii) Mike Kehoe, in his official capacity as Lt. Governor of Missouri and Commissioner of MHDC; (iv) Defendant Vivek Malek, in his official capacity as State Treasurer and Commissioner of MHDC; (v) Andrew Bailey, in his official capacity as Attorney General of Missouri and Commissioner of MHDC; (vi) Danny P. Chadakhtzian, in his official capacity as Commissioner of MHDC; (vii) Mark Elliff, in his official capacity as Commissioner of MHDC; (viii) Tracey S.C. Lewis, in his official capacity as Commissioner of MHDC; (ix) Rick McDowell, in his official capacity as Commissioner of MHDC; (x) Stephen J. Parshall, in his official capacity as Commissioner of MHDC; (xi) Tameka Randle, in her official capacity as Commissioner of MHDC; (xii) Kip Stetzler, in his official capacity as Executive Director of MHDC; and (xiii) Steve Whitson, in his official capacity as Director of Community Programs for MHDC (collectively "MHDC").

MHDC has developed, marketed, and administered its State Assistance for Housing Relief for Homeowners program on the basis of race. MHDC's discrimination in the provision of Covid-19 relief funds violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth in this Complaint, Plaintiffs and the proposed Class are entitled to damages, and, in the alternative, declaratory and injunctive relief.

## INTRODUCTION

1.      MHDC systematically discriminated against white homeowners when providing Covid-19 relief. As part of its State Assistance for Housing Relief ("SAFHR") for Homeowners program, MHDC prioritized "socially disadvantaged individuals" in everything from marketing to approving applications. MHDC impermissibly identified "socially disadvantaged individuals" based on their race.

2.      When asked to "describe the process" it would "use to identify whether a homeowner is a 'socially disadvantaged individual,'" MHDC admitted that its "software system" would track "identification of race and ethnicity." Missouri Department of Economic Development, U.S. Dep't of the Treasury, Homeowner Assistance Fund Plan HAFP-0080, at 10 (August 2021), https://perma.cc/MF3E-6XQ5 ("Missouri Plan Submission").

3.      As a result of MHDC's racial discrimination, white homeowners who struggled with the economic consequences of the Covid-19 pandemic—including Plaintiffs—lost out on financial assistance they needed to pay their mortgages. During the pandemic, Plaintiff Paul Bumpas's hours were cut at the Lake City Army Ammunition Plant, and he experienced a significant increase in household expenses, which made it difficult for him to pay his bills. But due to MHDC's discriminatory marketing and outreach about its SAFHR for Homeowners program, he never heard about the program. Similarly, Plaintiff Fred Van Noy's hours were cut at the car dealership where he works, and he too experienced a significant increase in household expenses during the pandemic. But when he applied for assistance through the SAFHR for Homeowners program, MHDC denied his application without providing a reason and despite his eligibility for assistance. Plaintiffs Bumpas and Van Noy—and many other Missouri homeowners like them—needlessly suffered financial hardships because of MHDC's race-based social agenda.

4.      There is no justification for MHDC's racial discrimination. MHDC could have administered its program in a race-neutral way, but it instead consciously chose to discriminate against white homeowners in favor of minority homeowners. But Covid-19 did not discriminate. Missouri homeowners of all races needed assistance.

5.      MHDC's racial discrimination is plainly unlawful. The Supreme Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). When the government treats citizens differently based on race, "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

6.      Plaintiffs and the Class are entitled to damages under Title VI. In the alternative, Plaintiffs and the Class are entitled to declaratory and injunctive relief under Title VI and the Equal Protection Clause.

## JURISDICTION & VENUE

7.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8.      This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Missouri.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant is a resident of this District and all Defendants are residents of Missouri, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Venue is also proper in this District under 28 U.S.C. § 1391(c)(2) because Defendant MHDC is an entity with

the capacity to sue and be sued and is subject to the Court's personal jurisdiction with respect to the civil action in question.

## PARTIES

10.    Plaintiff Paul Bumpas is a resident of Missouri.

11.    Plaintiff Fred Van Noy is a resident of Missouri.

12.    Defendant Missouri Housing Development Commission (MHDC) is an "instrumentality of the state of Missouri," created in 1969 by the Missouri General Assembly, and "constitutes a body corporate and politic" within the Department of Economic Development. MHDC, Mission & History, https://perma.cc/7FNN-V4J3; Missouri Dep't of Econ. Development, About, https://perma.cc/V5D7-CT9H. Among other things, MHDC "administer[s] several different Covid-19 housing assistance programs," including the SAFHR for Homeowners program. MHDC, Missouri Covid-19 Housing Assistance Programs, https://perma.cc/FS45-2QPS. MHDC was awarded and oversaw distribution of $138,269,336 in federal Homeowner Assistance Fund (HAF) funds from the U.S. Department of the Treasury. Missouri Plan Submission at 2. MHDC developed, marketed, and administered the SAFHR for Homeowners program.

13.    Defendant Mike Parson is the Governor of Missouri and a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. He also appoints six of the other Commissioners with the advice and consent of the Missouri Senate. Defendant Parson is sued in his official capacity.

14.    Defendant Mike Kehoe is the Lt. Governor of Missouri and a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Kehoe is sued in his official capacity.

4

15.    Defendant Vivek Malek is the State Treasurer and a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Malek is sued in his official capacity.

16.    Defendant Andrew Bailey is the Attorney General of Missouri and a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Bailey is sued in his official capacity.

17.    Defendant Danny P. Chadakhtzian is a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Chadakhtzian is sued in his official capacity.

18.    Defendant Mark Elliff is a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Elliff is sued in his official capacity.

19.    Defendant Tracey S.C. Lewis is a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Lewis is sued in his official capacity.

20.    Defendant Rick McDowell is a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant McDowell is sued in his official capacity.

21.    Defendant Stephen J. Parshall is a Commissioner of MHDC. In his role as a Commissioner, he oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Parshall is sued in his official capacity.

22.    Defendant Tameka Randle is a Commissioner of MHDC. In her role as a Commissioner, she oversees MHDC and its implementation of its housing programs, including the SAFHR for Homeowners program. Defendant Randle is sued in her official capacity.

23.    Defendant Kip Stetzler is the Executive Director of MHDC. In his role as Executive Director of MHDC, he is responsible for the operation of MHDC and the development, implementation, and administration of its programs, including the SAFHR for Homeowners program. Defendant Stetzler is sued in his official capacity.

24.    Defendant Steve Whitson is the Director of Community Programs for MHDC. In his role as Director of Community Programs, he was the primary contact for and oversaw development, implementation, and administration of Missouri's SAFHR for Homeowners program. Defendant Whitson is sued in his official capacity.

## LEGAL FRAMEWORK

25.    Federal law prohibits government officials from discriminating on the basis of race in the administration of government programs.

26.    As the Supreme Court recently explained, the "'core purpose' of the Equal Protection Clause is 'do[ing] away with all governmentally imposed discrimination based on race.'" *SFFA*, 600 U.S. at 206 (citation omitted). And "[e]liminating racial discrimination means eliminating *all of it*." *Id.* (emphasis added).

27.    Title VI codifies that core purpose of equal protection, providing that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

28.    Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a

6

violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n. 23 (2003)).

29.     Under both Title VI and the Equal Protection Clause, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

30.     Strict scrutiny is the most "daunting" standard of review. *SFFA*, 600 U.S. at 206. And for good reason—"racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz*, 539 U.S. at 276). Under that standard, courts ask (1) "whether the racial classification is used to 'further compelling governmental interests" and, if so (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citation omitted). But the Supreme Court has identified "only two compelling interests that permit resort to race-based government action"—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Outside of these "rare" and "most extraordinary case[s]," the Court has held that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (citation omitted).

## FACTUAL ALLEGATIONS

### I.    MHDC's Discriminatory Homeowner Assistance Fund Program

#### A.  American Rescue Plan Act's Homeowner Assistance Fund

31.     In March 2021, during the Covid-19 Pandemic, Congress enacted the American Rescue Plan Act ("ARPA" or "Act"), which (among other things) established the Homeowner

Assistance Fund. *See* Pub. L. No. 117- 2, § 3206, 135 Stat. 4, 63-67 (2021) (codified at 15 U.S.C. § 9058d).

32.    The fund, managed by the U.S. Department of the Treasury ("Treasury"), was designed to "prevent[ ] homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship." 15 U.S.C. § 9058d(c).

33.    Under the Act, the Treasury allocates funds to states "based on homeowner need" within each state, and the states distribute those funds as grants to homeowners who meet the states' requirements for receiving funds. *Id.* § 1958d(d)(2).

34.    Although the Act delegates authority to the Treasury to administer the overall program for purposes of distributing funds to the states, it largely leaves states to run their own specific programs based on their own implementation plans. The Treasury initially released 10% of each state's eligible funds for states to use in implementing pilot programs. To receive the rest of the funds, states were required to submit their proposed plans for implementing and administering the full program. When states submitted their plans, they requested a specific amount of funds. The Treasury would then review and provide feedback and recommendations on the states' plans before approving the plans and distributing the remaining funds. U.S. Department of the Treasury, HAF Plans, https://perma.cc/S8Z4-BQ8G.

### B.  U.S. Department of the Treasury's Guidance and the Definition of Socially Disadvantaged Individuals

35.    The Act requires states to distribute their funds to target specific populations of homeowners.

36.    First, it specifies that "[n]ot less than 60 percent of" funds shall be used to "assist homeowners having incomes equal to or less than 100 percent of the area median income for their

household size or equal to or less than 100 percent of the median income for the United States, . . . whichever is greater." *Id.* § 1958d(c)(2).

37.     Second, states must "prioritize remaining funds to socially disadvantaged individuals." *Id.*

38.     The Act does not define "socially disadvantaged individuals."

39.     In April 2021, the Treasury issued guidance to advise states on how to implement the HAF program. Among other things, the April 2021 guidance provided a recommended definition of socially disadvantaged individual, explicitly defining that term based on race and including a presumption that individuals of particular races were automatically socially disadvantaged individuals:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, and Asian Americans and Pacific Islanders. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with the procedures set forth at 13 CFR 124.103(c) or (d).

U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2 (Apr. 14, 2021), https://perma.cc/66WF-38TE (emphasis omitted).

40.     A few months later, in August 2021, the Treasury issued updated guidance, redefining the term "socially disadvantaged individual." The new definition still provided that individuals who were "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society" were socially disadvantaged. The full updated definition is as follows:

> Socially disadvantaged individuals are those whose ability to purchase or own a home has been impaired due to diminished access to credit on reasonable terms as compared to others in comparable economic circumstances, based on disparities in

homeownership rates in the HAF participant's jurisdiction as documented by the U.S. Census. The impairment must stem from circumstances beyond their control. Indicators of impairment under this definition may include being a (1) member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society, (2) resident of a majority-minority Census tract; (3) individual with limited English proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian Home Land, or (5) individual who lives in a persistent-poverty county, meaning any county that has had 20% or more of its population living in poverty over the past 30 years as measured by the three most recent decennial censuses. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with a process developed by a HAF participant for determining whether a homeowner is a socially disadvantaged individual in accordance with applicable law, which may reasonably rely on self-attestations.

Cong. Rsch. Serv., *The Homeowner Assistance Fund in American Rescue Plan Act: In Brief*, Cong. Rsch. Serv. at 8 (Sept. 20, 2021), https://perma.cc/9MBW-93MA (quoting U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2-3 (Aug. 2, 2021)).

41.     The Treasury has used the same socially disadvantaged individual definition in subsequent versions of the guidance, including the current version. *See* U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2–3 (June 12, 2023), https://perma.cc/K3V7-LPN8.

42.     The Treasury's guidance is not mandatory or binding on the States.

**C.  Missouri's State Assistance for Housing Relief for Homeowners Program**

43.     MHDC submitted its initial proposal for implementing its HAF plan in August 2021, and after receiving and responding to feedback from the U.S. Treasury, MHDC's final proposal was approved in January 2022. MHDC was awarded $138,269,336 in HAF funds. Missouri Plan Submission at 2.

44.     MHDC entitled its HAF program "Missouri State Assistance for Housing Relief (SAFHR) for Homeowners."

45.     Under MHDC's SAFHR for Homeowners program, homeowners were eligible for up to $50,000 of relief. Eligible homeowners could obtain relief in the form of mortgage

reinstatement or monthly mortgage payment assistance. SAFHR, Frequently Asked Questions, https://perma.cc/KM44-QTDS.

46.     MHDC's SAFHR for Homeowners program closed and stopped accepting new applications on May 31, 2024. MHDC, Missouri Covid-19 Housing Assistance Programs, https://perma.cc/297B-2PNC.

### D. MHDC Considered Race When Developing, Marketing, and Administering Its State Assistance for Housing Relief for Homeowners Program

47.     In developing its SAFHR for Homeowners program, MHDC chose to adopt the race-based definition of socially disadvantaged individuals offered in non-binding Treasury guidance.

48.     MHDC's plan submission stated that it would "adhere to the U.S. Department of the Treasury's definition of socially disadvantaged individuals," including the factor of being a "member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Missouri Plan Submission at 10.

49.     Specifically, MHDC assumed that applicants that identified themselves as particular races and ethnicities were automatically socially disadvantaged individuals. In explaining the "process" it would "use to determine whether a homeowner is a 'socially disadvantaged individual' as defined in the HAF guidance," MHDC explained that its "contracted software system ha[d] developed flagged responses to application questions to identify" the Treasury's socially disadvantaged individual indicators "*along with identification of race or ethnicity*." *Id.* (emphasis added). In other words, MHDC presumed that homeowners who identified as non-white races or ethnicities in their applications were socially disadvantaged.

50.     MHDC utilized its race-based definition of socially disadvantaged individuals in deciding how to develop its program, how and where to market and advertise its program, and how

to prioritize granting applications and distributing program funds. In doing so, it prioritized minority homeowners over white homeowners.

51.     In developing its plan, MHDC conducted "outreach to business, community and faith groups representing socially disadvantaged individuals." MHDC, HAFP-0080-Missouri, Responses to Treasury Feedback for Resubmission of Plan, at 2, https://perma.cc/M5P9-AJW4 ("Response to Treasury Feedback"). It considered race in developing policies and procedures for how (and to whom) to conduct outreach about its program and how to prioritize financial relief to socially disadvantaged individuals.

52.     In marketing and advertising its program to inform Missouri citizens about the availability of funds and how to apply, MHDC targeted outreach to racial minorities—at the expense of non-minority homeowners—based on its definition of socially disadvantaged individuals. MHDC's plan submission indicates that MHDC made "public communications" and undertook "community outreach efforts" to market its SAFHR for Homeowners program by partnering "with organizations that primarily target" "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Missouri Plan Submission at 10-11.

53.     MHDC stated that it would "utilize a variety of opportunities to provide targeted communication and education around SAFHR for Homeowners for socially disadvantaged individuals." Response to Treasury Feedback at 1. Specifically, to target socially disadvantaged individuals, MHDC stated that it would "identify areas of greatest need of assistance" and partner with "organizations and entities that specifically connect with some of the disadvantaged populations." *Id.* at 1. These included "the Black Chamber of Commerce, Hispanic Chamber of Commerce, American Indian Council, Metro St. Louis Equal Housing, Opportunity Council, Empower Missouri, and more." *Id.* at 1-2. MHDC also said it would "utilize geographic targeting strategies" to

provide "marketing materials" to targeted counties. *Id.* at 1. MHDC "work[ed] with a broad number of community partners to provide culturally relevant outreach through entities that have established community relationships across the state." *Id.* at 6. MHDC also engaged a "marketing firm" to "[t]o effectively reach all targeted groups" through an "advertising campaign that will align with all geographic and demographic methodology." *Id.* at 2.

54.     MHDC also utilized mortgage services to direct outreach to socially disadvantaged individuals. MHDC stated that it "work[ed] with servicers to provide materials and assistance to reach out to delinquent portfolios *aligning with targeted groups*." *Id.* (emphasis added). It also utilized "the Common Data File (CDF) process as the standardized communication with servicers for exchange of loan level information to determine homeowner eligibility for HAF funds, specifically reinstatement," and it "developed a coaching sheet to guide local banks, credit unions, and smaller servicers through the CDF process." MHDC, U.S. Dep't of the Treasury HAF Annual Report, at 14 (2022), attached as Ex. A ("HAF Annual Report 2022").

55.     In reviewing and granting applications, MHDC prioritized applications based on race, prioritizing applications submitted by minority homeowners over white homeowners. MHDC stated that it "prioritize[d]" socially disadvantaged individuals by "work[ing] closely with a contracted software solutions company" to "identify each homeowner applicant's demographic data," including identifying "homeowner applicants that are members of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Response to Treasury Feedback at 6. MHDC utilized the "software vendor" to "provide[ ] real-time reporting for the state to review and assess distribution of assistance." HAF Annual Report 2022 at 11. This prioritization included preference in granting and denying applications and distribution of funds—*i.e.*,

applications submitted by minority homeowners were given priority over applications submitted by white homeowners.

56.    MHDC's online application included dropdown options for applicants to select their race and ethnicity. MHDC, SAFHR For Homeowners Application Process Walkthrough, at 1:20 (April 25, 2022), https://perma.cc/6NBB-J3HB. And MHDC's "contracted software system" "tracked and reported" "race and ethnicity" of applicants for purposes of MHDC's "process" for "determin[ing] whether a homeowner is a 'socially disadvantaged individual.'" Missouri Plan Submission at 10.

57.    MHDC set a "[p]erformance [g]oal" of ensuring that "70% of homeowners served" under SAFHR for Homeowners were "at or below 100% [area median income] or socially disadvantaged individuals." Missouri Plan Submission at 14. And one of MHDC's "indicators of the success" of its program was the "[p]ercent of targeted populations served (at or below 100% [area median income] or [socially disadvantaged individuals])." Response to Treasury Feedback at 6. MHDC stated that its "strategic outreach to areas of need across the state, . . . resulted in equitable distribution of funds (as seen in Missouri's performance goals)." HAF Annual Report 2022 at 11.

58.    MHDC's use of a race-based definition of socially disadvantaged individuals is reflected in the demographics of its application statistics. *Out of the approved applications, 43% of homeowners were black and 55% of homeowners were white*, Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q1, 2024, https://perma.cc/Y3JT-RYDZ, *despite the fact that 11.7% of Missouri citizens are black and 82.4% are white*, U.S. Census Bureau, Quick Facts: Missouri, https://perma.cc/Z56M-YWLD. This dramatic difference cannot be explained by income disparities or other race-independent reasons. For example, comparing census and poverty rate data, about

14

24.4% of Missouri citizens below the poverty line are black and 73.2% are white. *See id.*; KFF, State Health Facts: Poverty Rate by Race/Ethnicity (2022), https://perma.cc/H2DA-E5KH.

## II.  Effect of MHDC's Racial Discrimination on Plaintiffs

59.     Because of MHDC's race-based implementation of its SAFHR for Homeowners program, Plaintiffs were deprived of the opportunity to learn about the program and apply for assistance, were deterred from doing so, or were denied assistance after applying because of their race.

### A.  Plaintiff Paul Bumpas

60.     Plaintiff Paul Bumpas is a resident of Missouri.

61.     Plaintiff Bumpas is white.

62.     Plaintiff Bumpas owns a home in Jackson County, Missouri, and has a mortgage on the home.

63.     Plaintiff Bumpas works at the Lake City Army Ammunition Plant in Independence, Missouri.

64.     In the wake of the Covid-19 pandemic, Plaintiff Bumpas's hours were cut at the Lake City plant. As a result, he experienced a significant decrease in income.

65.     Plaintiff Bumpas also experienced a significant increase in housing and living expenses after the start of the Covid-19 pandemic.

66.     Plaintiff Bumpas was infected with Covid-19 on two occasions. During his first Covid-19 infection, Plaintiff Bumpas went to the emergency room to seek care, which resulted in significant medical bills.

67.     Due to these financial hardships related to the Covid-19 pandemic, Plaintiff Bumpas struggled to pay his bills. In order to keep paying his mortgage and keep his home,

Plaintiff Bumpas was forced to refinance his mortgage, forgo things like cable television, and take on additional debt, including credit card debt. As his debt has continued to increase, he continues to struggle to make his monthly mortgage payment.

68.    Due to MHDC's discriminatory marketing and outreach regarding its SAFHR for Homeowners program, Plaintiff Bumpas never heard of the program.

69.    Because Plaintiff Bumpas never heard about the program as a result of MHDC's discriminatory marketing and outreach, he was unable to apply for and obtain financial assistance—for which he plainly qualified—before the program closed to new applications in May 2024.

70.    Had Plaintiff Bumpas been informed about the program by MHDC, he would have applied for and been eligible for assistance, including monthly mortgage payment assistance. If MHDC had not discriminated on the basis of race in administering the program, Plaintiff Bumpas would have received much-needed Covid-19 relief.

**B.  Plaintiff Fred Van Noy**

71.    Plaintiff Fred Van Noy is a resident of Missouri.

72.    Plaintiff Van Noy is white.

73.    Plaintiff Van Noy owns a home in Jackson County, Missouri, and has a mortgage on the home.

74.    Plaintiff Van Noy works at a car dealership near Jackson County, Missouri.

75.    In the wake of the Covid-19 pandemic, Plaintiff Van Noy's hours were cut at the car dealership. As a result, he experienced a significant decrease in income.

76.    Plaintiff Van Noy also experienced a significant increase in housing and living expenses after the start of the Covid-19 pandemic.

77.     Due to these financial hardships related to the Covid-19 pandemic, Plaintiff Van Noy struggled to pay his bills, including his mortgage.

78.     Plaintiff Van Noy applied for financial assistance through MHDC's SAFHR for Homeowner's program in 2024 while the program was still accepting applications.

79.     Plaintiff Van Noy was eligible for financial assistance through MHDC's SAFHR for Homeowners program.

80.     Plaintiff Van Noy applied for relief under the program, but MHDC denied his application without explanation.

81.     On information and belief, MHDC's denial of Plaintiff Van Noy's application was due to MHDC's race-based decisions, including its prioritization of applications and distribution of funds.

82.     Plaintiff Van Noy would have received financial assistance had MHDC not discriminated based on race.

83.     Because Plaintiff Van Noy's application was denied, he was unable to obtain financial assistance for his mortgage, including monthly mortgage payment assistance.

## CLASS ALLEGATIONS

84.     Plaintiffs bring this action on behalf of themselves and other Missouri homeowners similarly entitled to relief.

85.     The Class here consists of:

    a.     All Missouri homeowners who applied for assistance under MHDC's SAFHR for Homeowners program, were eligible for funds under the program, who are white, who otherwise did not meet MHDC's definition of socially disadvantaged individual, and who had their applications denied by MHDC because of MHDC's race-based prioritizing of applications.

b.  All Missouri homeowners who were eligible for funds under MHDC's SAFHR for Homeowners program, are white, who otherwise did not meet MHDC's definition of socially disadvantaged individual, and who never learned about the program because of MHDC's race-based marketing and outreach.

86.   Class members are seeking damages from MHDC under Title VI for unlawful discrimination in the development, marketing, and administration of the SAFHR for Homeowners program.

87.   In the alternative, Class members are seeking declaratory and injunctive relief under both Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the SAFHR for Homeowners program unlawful and requiring MHDC to reopen the program, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

88.   The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families.

89.   The proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of homeowners in Missouri and the thousands of homeowners who applied for the SAFHR for Homeowners program, there are at least thousands of members of the proposed Class.

90.    Common questions of law and fact exist with respect to the Class. *See* Fed. R. Civ. P. 23(a)(2). Those questions include:

    a.    Whether MHDC defined and applied its "socially disadvantaged individual" criterion in a racially discriminatory manner;

    b.    Whether MHDC intentionally targeted non-white homeowners in its SAFHR for Homeowners marketing;

    c.    Whether MHDC intentionally prioritized non-white homeowners in its re-view of SAFHR for Homeowners applications;

    d.    Whether MHDC discriminated against Class members on the basis of their race;

    e.    Whether Defendants' challenged conduct violates Title VI; and

    f.    Whether MHDC's challenged conduct violates the Equal Protection Clause.

91.    Plaintiffs' claims are typical of those of the other Class members. *See* Fed. R. Civ. P. 23(a)(3). All members of the Class are Missouri homeowners, who were eligible for funds under the SAFHR for Homeowners program, are white and otherwise did not meet MHDC's definition of socially disadvantaged individuals, and who either (i) applied for the program and were denied funds or (ii) never learned of the program in the first place because of their race. They were there-fore similarly affected by MHDC's wrongful conduct complained of herein.

92.    Plaintiffs will fairly and adequately protect the interests of all Class members. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs' counsel is competent and experienced in litigating complex cases involving class actions and litigating federal Constitutional and statutory rights. Plaintiffs have no interests adverse or antagonistic to the Class.

93.     The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only individual members of the Class. All Class members are entitled to similarly race-blind development, marketing, and implementation of state housing assistance programs distributing federal funds. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the Class can be readily ascertained from analysis of records in the possession of Defendants, mortgage servicer information, and publicly available data. Prosecution as a class action will eliminate the possibility of unnecessary, repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein, particularly given that the Class involves homeowners in need of mortgage assistance in the wake of the Covid-19 pandemic.

94.     Alternatively, the Class is certifiable under Federal Rule of Civil Procedure 23(b)(2). MHDC has discriminated on grounds that apply generally to the Class—namely, prioritizing applications and marketing the SAFHR for Homeowners program based on race. Therefore, declaratory and injunctive relief declaring that MHDC's development, marketing, and implementation of its SAFHR for Homeowners program is unlawful and requiring MHDC to reopen the program, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis is appropriate respecting the Class as a whole.

## CLAIMS

### COUNT I
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN PRIORITIZATION OF APPLICATIONS

95.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

96.    **Federal law prohibits discrimination on the basis of race.** Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

97.    This provision of Title VI may be enforced by a private right of action. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001).

98.    "The two elements for establishing a cause of action pursuant to Title VI are (1) that the entity involved is engaging in [intentional] racial or national origin discrimination and (2) the entity involved is receiving federal financial assistance." *Jackson v. Conway*, 476 F. Supp. 896, 903 (E.D. Mo. 1979), *aff'd*, 620 F.2d 680 (8th Cir. 1980); *Alexander*, 532 U.S. at 280.

99.    Intentional race discrimination can take the form of a policy that is discriminatory on its face or a facially neutral policy that was adopted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3rd Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

100.    "Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin" because "Title VI bears independent force beyond the Equal Protection Clause." *SFFA*, 600 U.S. at 309-10 (Gorsuch, J., concurring).

101.    But at a minimum, Title VI is coextensive with the protections of the Equal Protection Clause. U.S. Const. amend. XIV, § 1. ("No State shall . . . deny to any person within its

jurisdiction the equal protection of the laws."). Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (citation omitted); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause.").

102.    **Racial classifications are subject to strict scrutiny.** Under both Title VI and the Equal Protection Clause, racial classifications are subject to strict scrutiny. "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Therefore, state agencies may not provide a benefit, such as distribution of funds, on the basis of race without satisfying strict scrutiny.

103.    Under strict scrutiny, the government must show that its racial classification "further[s] compelling governmental interests." *SFFA*, 600 U.S. at 206-07 (citation omitted). Remedying "societal discrimination," however, is *never* a compelling interest because "[s]uch an interest presents 'an amorphous concept of injury that may be ageless in its reach into the past.'" *Id.* at 226 (citation omitted). Thus, generalized claims of remedying past "societal discrimination" "cannot 'justify a [racial] classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries" of the race-based government "program are thought to have suffered." *Id.* (citation omitted). Moreover, a "generalized assertion" of "past discrimination" is not a compelling interest because it "provides no guidance for [the government] to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

104.    Rather, for the government to have a compelling interest in remedying past discrimination, (1) "the policy must target a specific episode of past discrimination," (2) "there must be evidence of *intentional* discrimination in the past," and (3) "the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (citing *J.A. Croson Co.*, 488 U.S. at 492, 498, 503).

105.    If the government can show that a racial classification somehow serves a compelling interest, it then must show that its classification is "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207. To be narrowly tailored, a racial classification must be "sufficiently focused" on obtaining "measurable objectives warranting the use of race." *Id.* at 230. This means that it must be targeted—i.e., it cannot be over- or under-inclusive. *See id.* at 216; *see also Vitolo*, 999 F.3d at 361-62. Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *Id.* at 218. Finally, a court may not uphold a race-based policy unless it is "satisfied that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

106.    **MHDC's Use of Race in Prioritizing Applications Fails Strict Scrutiny.** MHDC received federal financial assistance from the HAF program and intentionally used those federal funds to prioritize granting applications and distributing funds to minority homeowners over white homeowners through its SAFHR for Homeowners program.

107.    MHDC used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and prioritized applications submitted by those "socially disadvantaged individuals" over white homeowners.

108.    Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term

23

"socially disadvantaged individuals." *See, e.g.*, *Vitolo*, 999 F.3d at 364 (holding that Small Business Administration's (SBA) distribution of Restaurant Revitalization Funds and prioritization of "socially disadvantaged" applicants based on race failed strict scrutiny); *Nuziard v. Minority Bus. Dev. Agency*, No. 2024 WL 965299, at *40 (N.D. Tex. Mar. 5, 2024) (holding that Minority Business Development Agency's distribution of financial assistance to "socially disadvantaged" applicants based on race failed strict scrutiny); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (holding that USDA's and SBA's preferential awarding of government contracts to "socially disadvantaged individuals" based on race failed strict scrutiny).

109.    Because MHDC's SAFHR for Homeowners program prioritized applications based on race, strict scrutiny applies.

110.    MHDC's race-based prioritization scheme for reviewing and granting applications through its SAFHR for Homeowners program fails to satisfy strict scrutiny.

111.    MHDC's use of race in prioritizing applications to socially disadvantaged individuals does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the Covid-19 pandemic, not to remedy some specific, identifiable past form of discrimination to a particular racial group. Indeed, the Covid-19 pandemic affected homeowners of all races.

112.    Moreover, MHDC's use of race to prioritize socially disadvantaged individuals over white homeowners does not remediate any specific, identified instances of past discrimination. Rather, the SAFHR for Homeowners program is simply based on generalized claims of remedying past "societal discrimination": declaring homeowners socially disadvantaged individuals if they are "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Missouri Plan Submission at 10; *see id.* (adopting the Treasury's

definition of "socially disadvantaged individuals"). In other words, the program was not targeted toward some specific episode of past, intentional discrimination that the MHDC participated in.

113.    Even if MHDC could show a compelling interest in its race-based SAFHR for Homeowners program, the program is not narrowly tailored.

114.    *First*, MHDC failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without prioritizing applications according to a race-based socially disadvantaged individual definition.

115.    For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and prioritized applications from those homeowners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK.

116.    California, too, used race-neutral criteria to prioritize aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and prioritized applications from those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 11 (Dec. 9, 2021), https://perma.cc/US78-H75J. As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/K4ZK-NDFB. As defined by UCLA's Center for Neighborhood Knowledge, the

"Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/CZX8-UENW.

117.    MHDC could have also defined socially disadvantaged individual status based on other geographic locations, family size, risk of eviction, mortgage debt, or countless other race-neutral factors and prioritized applications based on those race-neutral factors. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

118.    *Second*, MHDC's prioritizing applications for socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that minority homeowners are disadvantaged while white homeowners, regardless of the financial impact they experienced related to the Covid-19 pandemic, are not. And in the context of distributing federal benefits, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. MHDC's program had "finite resources," which means that prioritization matters—applicants deemed socially disadvantaged individuals based on their race have earlier and easier access to funds than applicants who do not meet the racial criteria, and applicants at the back of the line risk obtaining no funds at all when the funds are exhausted. *Nuziard*, 2024 WL 965299 at *36 ("[T]he fact that the latter applicants have a back-door to benefits doesn't change the initial disadvantage conferred by the stereotype."); *see SFFA*,

600 U.S. at 219 ("How else but 'negative' can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?").

119.    *Third*, MHDC's SAFHR for Homeowners program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by prioritizing homeowners' applications based on race. For one, it is underinclusive—the program excludes minority homeowners who do not fall within its income limits, even if they experienced discrimination. It is also overinclusive—it prioritizes applications submitted by non-white homeowners regardless of whether those homeowners or their specific racial group experienced housing discrimination. And, in general, prioritizing a minority applicant who lost his job due to supply chain issues caused by the Covid-19 pandemic and has trouble making mortgage payments due to the loss of income has nothing to do with remediating past discrimination.

120.    Because MHDC's intentional use of race in prioritizing applications as a part of its SAFHR for Homeowners program fails strict scrutiny, MHDC's actions violate the Equal Protection Clause and Title VI.

121.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of MHDC's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all SAFHR for Homeowners funds that they have been wrongfully deprived of because of their race.

122.    Plaintiffs and other Class members are also entitled to nominal damages for MHDC's completed violation of their legal rights under the Equal Protection Clause and Title VI.

123.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that MHDC's SAFHR for Homeowners program violates Title VI and

the Equal Protection Clause and requiring MHDC to reopen the program and reconsider denied applications on a race-neutral basis.

124.    Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## COUNT II
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN MARKETING AND OUTREACH

125.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

126.    MHDC received federal financial assistance from the HAF program and intentionally used those federal funds to market its SAFHR for Homeowners program to minority homeowners at the expense of white homeowners.

127.    MHDC used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and it developed and implemented an outreach and marketing program to advertise its SAFHR for Homeowners program to socially disadvantaged individuals. White homeowners were not targeted for outreach or marketing as part of MHDC's marketing plan.

128.    Many eligible white homeowners—like Plaintiff Bumpas—thus had no idea they could obtain the significant financial assistance the SAFHR for Homeowners program offered. Had eligible white homeowners like Plaintiff Bumpas known about the program, they would have applied and obtained substantial financial assistance.

129.    Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364; *Nuziard*, 2024 WL 965299 at *40; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774.

130.    Because MHDC's SAFHR for Homeowners program chose to market and conduct other outreach efforts to homeowners based on race, strict scrutiny applies.

131.    MHDC's race-based marketing plan for advertising and informing homeowners about its SAFHR for Homeowners program fails to satisfy strict scrutiny.

132.    MHDC's use of race in deciding how and to whom to market its program does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the Covid-19 pandemic, not to remedy some specific, identifiable past form of discrimination to a particular racial group. Indeed, the Covid-19 pandemic affected homeowners of all races.

133.    Moreover, MHDC's use of race to market its program to socially disadvantaged individuals over white homeowners does not remediate any specific, identified instances of past discrimination.

134.    Even if MHDC could show a compelling interest in its race-based SAFHR for Homeowners program, the program is not narrowly tailored.

135.    *First*, MHDC failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without marketing their programs to specific racial minority groups rather than to all eligible homeowners.

136.    For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and targeted marketing and outreach to those homeowners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK.

137.    California, too, used race-neutral criteria to target outreach about aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index

(OVI), developed by the UCLA Center for Neighborhood Knowledge" and targeted marketing and outreach to those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 11 (Dec. 9, 2021), https://perma.cc/US78-H75J. As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/K4ZK-NDFB. As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/CZX8-UENW.

138.    MHDC could have marketed its program equally across the state, ensuring that all eligible homeowners had equal opportunity to learn about the available financial assistance. MHDC could have also targeted its marketing to specific areas or specific homeowners based on race-neutral factors like income, poverty level, family size, eviction rates, mortgage delinquencies, etc. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

139.    *Second*, MHDC's marketing to socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that minority homeowners are

disadvantaged while white homeowners, regardless of the financial impact they experienced related to the Covid-19 pandemic, are not. In other words, MHDC decided it was more important that homeowners of certain racial groups hear about the program rather than homeowners who are members of disfavored races. And in the context of marketing a program that distributes federal benefits, marketing to some homeowners but not others "necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. MHDC's program had "finite resources," which means that marketing mattered—homeowners deemed socially disadvantaged individuals based on their race have earlier and easier opportunity to learn about the program (and apply for funds) than homeowners who do not meet the racial criteria, and applicants who do not hear about the program (or hear about it too late) risk obtaining no funds at all when the funds are exhausted. *Nuziard*, 2024 WL 965299 at *36; *see SFFA*, 600 U.S. at 219.

140.    *Third*, MHDC's SAFHR for Homeowners program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by marketing the program to certain homeowners but not others based on race. For one, it is underinclusive—the program excludes minority homeowners who do not fall within its income limits, even if they experienced discrimination. And to the extent MHDC marketed to certain geographic areas but not others based on race, that too is underinclusive because it ignores minority homeowners in other non-targeted geographic areas. It is also overinclusive—it markets the program to homeowners based on race, regardless of whether those homeowners or their specific racial group experienced housing discrimination and regardless of whether the homeowners are eligible for benefits under the program.

141.    Because MHDC's intentional use of race in marketing its SAFHR for Homeowners program fails strict scrutiny, MHDC's actions violate the Equal Protection Clause and Title VI.

142.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of MHDC's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all SAFHR for Homeowners funds that they have been wrongfully deprived of because of their race.

143.    Plaintiffs and other Class members are also entitled to nominal damages for MHDC's completed violation of their legal rights under the Equal Protection Clause and Title VI.

144.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that MHDC's SAFHR for Homeowners program violates Title VI and the Equal Protection Clause and requiring MHDC reopen the program and consider new applications on a race-neutral basis.

145.    Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Plaintiffs request relief and judgment as follows:

a.  Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;

b.  Award Plaintiffs and the Class members compensatory damages for Defendants' violation of Title VI, in an amount to be proven at trial, including interest thereon;

c.  Award Plaintiffs and the Class members nominal damages for Defendants' completed violation of Title VI and the Equal Protection Clause;

d.  Alternatively, declare that Defendants' racially discriminatory development, marketing, and administration of its SAFHR for Homeowners program violates the Equal Protection Clause and Title VI and enter an injunction requiring Defendants to reopen the program, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis;

e.  Enter judgment in favor of Plaintiffs and the Class members;

f.  Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

g.  Order such further relief as the Court may deem proper and just.

Dated: July 29, 2024

Respectfully submitted,

/s/ *Benjamin D. Mooneyham*

Jonathan F. Cohn*
2972578 (NY)
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
jon@lkcfirm.com

Benjamin D. Mooneyham   #65341(MO)
GM Law PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
(816) 471-7700
benm@gmlawpc.com

William T. Thompson*
24088531 (TX)
Matthew H. Frederick*
24040931 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com
matt@lkcfirm.com

David B. Helms            #48941(MO)
GM Law PC
8000 Maryland Avenue, Suite 1060
St. Louis, MO
(314) 474-1750
davidh@gmlawpc.com

Jared B. Magnuson*
131189 (GA)
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiffs*